UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MARILYN SHAZOR,                    :
                                   :    NO. 1:11-CV-150
         Plaintiff,                :
                                   :    **OPINION & ORDER**
                                   :
    v.                             :
                                   :
                                   :
PROFESSIONAL TRANSIT               :
MANAGEMENT, LTD, et al.,           :
                                   :
         Defendants.

        This matter is before the Court on cross motions for
summary judgment and the respective responses and replies (docs.
48, 50, 54, 55, 56 & 57).  Because the Court finds that no
genuine issues of material fact exist as to whether Plaintiff's
employment was impermissibly terminated on the basis of race
and/or sex, the Court GRANTS Defendants' motion as to
Plaintiff's discrimination claims and DENIES Plaintiff's motion.

**I.  BACKGROUND**

        Defendant Professional Transit Management, LTD ("PTM")
is a public transportation management company that, at all
relevant times, provided management services to the Southwestern
Ohio Regional Transit Authority ("SORTA"), which operates bus
services in southwestern Ohio.  Pursuant to the contract between

1

PTM and SORTA, PTM hired and supervised SORTA's CEO, and the CEO was a fulltime employee of PTM.  Plaintiff's relationship with PTM began in 2006 when she was hired as SORTA's Chief Operating Officer by SORTA's then-CEO (and PTM founder) Michael Setzer. She reported to and was supervised by Setzer in that role until March 31, 2008, at which point Setzer's role with the company changed, and Plaintiff was promoted to the position of SORTA CEO.  At the request of members of SORTA's board, Setzer acted as a mentor and consultant to Plaintiff in her new role.  In August 2009, Setzer conducted the first yearly evaluation of Plaintiff's performance as CEO, finding her performance to be satisfactory overall but that she failed to meet expectations in the areas of fostering mutual support and rapport with the team. Around this same time, Thomas Hock, PTM's president and founder, became Plaintiff's direct supervisor, and he continued in that role until he terminated Plaintiff's employment in August 2010.

At various points in 2009, Setzer exchanged emails with Will Scott, in which they criticized Plaintiff's performance.  During this time period, Scott was President of PTM; he retired from PTM at the end of 2009 and continued as a consultant for another year.  The emails contained derogatory descriptors of Plaintiff, including that she lacked class, that she "sounds like" a "fool", that her conduct was like a "punk",

and that she behaved like a "prima donna". On some of these emails, Hock was copied, but he was not the author of any of them. In an email from Scott to Setzer on April 12, 2010, Scott said that Plaintiff "turned out to be one helluva bitch". Hock was not copied on that email.

On August 20, 2010, Defendant Hock terminated Plaintiff's employment on the basis that, according to Hock, Plaintiff misrepresented information to SORTA's board on two occasions. Hock then assumed the responsibilities of CEO for approximately one month, and then PTM hired, with SORTA's consent, a Hispanic woman as CEO. Plaintiff, who is African American, contends that her employment was instead terminated because of Defendants' race and/or sex-based animus.

In her complaint, Plaintiff claims (i) that her termination resulted from discrimination on the basis of race and/or gender, in violation of 42 U.S.C. §1981 and 42 U.S.C. §§2000e, et seq. and Ohio Rev. Code 4112 (Counts I, II & IV)[1];

---

[1] The Court notes that, while Chapter 4112.02 of the Ohio Revised Code prohibits an employer from terminating an employee on the basis of color, religion, sex, military status, national origin, disability, age or ancestry, see Ohio Rev. Code §4112.02, Plaintiff drafted her Ohio-law discrimination claim to encompass only race-based discrimination (doc. 1). Regardless, state-law-based sex and race discrimination claims are generally construed in the same manner as federal laws because Ohio anti-discrimination laws prohibit the same conduct as Title VII. Shoemaker-Stephen v. Montgomery County Bd. of Com'rs, 262 F.Supp.2d 866, 874 (S.D. Ohio 2003). Thus, the Court's analysis

3

(ii) defamation, libel and slander, in violation of Ohio common law (Count III); and tortious interference with a business relationship (Count V). Plaintiff and Defendants each filed motions for summary judgment, and the Court heard arguments on the motions on December 20, 2012, making the motions ripe for the Court's decision.

## II. STANDARD

A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; see also, e.g., Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464 (1962); LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993); Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir. 1992) (per curiam). In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

---

and decisions with respect to Plaintiff's federal Title VII claims apply with equal force to her state-based race claim, Count IV.

<u>Fatton v. Bearden</u>, 8 F.3d. 343, 346 (6th Cir. 1993), <u>quoting</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 251-252 (1986) (internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and non-movant are well settled. First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact [.]" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>see also</u> <u>LaPointe</u>, 8 F.3d at 378; <u>Guarino v. Brookfield Township</u> <u>Trustees</u>, 980 F.2d 399, 405 (6th Cir. 1982); <u>Street v. J.C.D.</u> <u>Bradford & Co.</u>, 886 F.2d 1472, 1479 (6th Cir. 1989). The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case. <u>See</u> <u>Barnhart v. Pickrel, Shaeffer & Ebeling Co. L.P.A.</u>, 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to

negate the existence of that material fact. See Celotex, 477 U.S. at 317; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). As the "requirement [of the Rule] is that there be no genuine issue of material fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-248 (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-340 (6th Cir. 1993); see also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough

6

specificity that the district court can readily identify the facts upon which the non-moving party relies." Guarino, 980 F.2d at 405, quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) (internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. See McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir. 1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); United States v. Diebold, Inc., 369 U.S. 654 (1962). Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute. See Matsushita, 475 U.S. at 587. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the court to demonstrate that summary judgment is appropriate. See Guarino, 980 F.2d at 410; Carver v. Bunch, 946 F.2d 451, 454-455 (6th Cir. 1991).

**III. Discussion**

7

### A. No Direct Evidence

Plaintiff contends that she has presented direct evidence of discrimination, thus taking this case out of the realm of the familiar McDonnell Douglas burden-shifting framework for single-motive discrimination claims. Specifically, she argues (i) that the emails exchanged between Setzer and Scott are direct evidence of sex-and-race-based animus and (ii) that the following constitute direct evidence that Setzer and Scott were decision-makers: Scott, Setzer and Hock were the three principals of the company for which Plaintiff worked; at various points Plaintiff was supervised by one or more of them; Scott was present at the meeting where she was terminated; in the four months between the "helluva bitch" comment and Plaintiff's termination, Hock had conferences with Scott and/or Setzer; and Scott, who made the "helluva bitch" comment, sent to Hock a generic termination checklist in advance of the termination meeting.

While the Court finds the emails exchanged between Setzer and Scott to be disturbing, distasteful, and highly unprofessional, the Court need not decide whether the use of the words "punk", "prima donna", "fool", "Her Highness", and "helluva bitch" in the contexts in which they were used here constitutes direct evidence of impermissible discrimination.

8

This is so because Plaintiff has not adduced direct evidence showing that Setzer and Scott were involved in the decision to terminate Plaintiff's employment. As Defendants note, in order for statements to constitute direct evidence of discrimination, they must have been made by the decision-maker, and they must relate to the adverse employment action. See, e.g., Blair v, Henry Filters, Inc., 505 F.3d 517, 524-5 (6th Cir. 2007)(abrogated on other grounds)(holding that where an inference is necessary to connect the statement at issue to the adverse employment action, the statement cannot be direct evidence of animus).

Here, Plaintiff's evidence fails on both fronts. First, the evidence in the record unequivocally shows (i) that Hock was Plaintiff's sole supervisor at the time of her termination and for the previous year and (ii) that Hock did not make any of the derogatory statements at issue here. In the face of this evidence, Plaintiff contends that Setzer and Scott were "involved in" the decision to terminate her employment, which would put their comments in the realm of direct evidence (doc. 55, citing Bernstein v. Sephora, 182 F.Supp.2d 1214, 1220 (S.D. Fl. 2002)). Unfortunately for Plaintiff, the evidence upon which she relies for this contention cannot in any way be considered direct evidence. In the Sixth Circuit, "direct

9

evidence" is that which is probative of an alleged fact without requiring further inference. _Rowan v. Lockheed Martin Energy Sys., Inc._, 360 F.3d 544, 548 (6th Cir. 2004). It is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." _Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp._, 176 F.3d 921, 926 (6th Cir. 1999). And, "the evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [race and/or sex], but also that the employer acted on that predisposition." _Hein v. All America Plywood Co._, 232 F.3d 482, 488 (6th Cir. 2000).

The facts upon which Plaintiff relies, even viewed in the light most favorable to Plaintiff, simply do not require the conclusion that Setzer and Scott were involved in the decision to terminate Plaintiff's employment. It is possible that a reasonable jury could infer their involvement from the facts that Scott, Setzer and Hock were the three principals of the company for which Plaintiff worked; at various points Plaintiff was supervised by one or more of them; Scott was present at the meeting where she was terminated; in the four months between the "helluva bitch" comment and Plaintiff's termination, Hock had conferences with Scott and/or Setzer; and Scott, who made the

10

"helluva bitch" comment, sent to Hock a generic termination checklist in advance of the termination meeting.  However, none of these facts alone or in combination requires the conclusion that Scott and Setzer were involved in the decision to terminate Plaintiff's employment.

A jury could reasonably infer that, because Scott, Setzer and Hock were the principals of Defendant PTM, and because they each appear to have been involved in supervising Plaintiff at various points in her career, they consulted with each other about her performance and its impact on the company. But there is no direct evidence that they collaborated in that way, and a jury would in no way be required to reach that conclusion. Similarly, a jury could reasonably infer from the facts that Hock, Setzer and Scott were present at meetings or conferences during the period between the "helluva bitch" comment and Plaintiff's termination, that Scott was present at the termination meeting, and that he provided a generic checklist to Hock in advance of the meeting that Scott, at least, was involved in the decision to terminate her employment.[2]

_____

[2] All of these inferences, of course, would only be reasonable if the jury also discredited the testimony of Hock, Setzer and Scott, each of whom is on record as saying that Hock and Hock alone made the decision to terminate Plaintiff's employment.  That is a credibility decision that would rest with the jury, but even if the jury chose to disbelieve the three of them, the inferences discussed herein would still be necessary

However, Plaintiff has provided no evidence of what was discussed at any of the conferences and no evidence that Scott's presence at the termination meeting or the generic checklist were anything other than routine measures. Therefore, in order to conclude from the evidence presented that Scott and Setzer were involved in Plaintiff's termination, inferential leaps are required. Such leaps would not necessarily be unreasonable, but the fact that leaps must be taken to reach that conclusion means that the evidence upon which Plaintiff relies is not direct evidence. See, e.g., Jacklyn, 176 F.3d at 928.

Simply put, because the statements were not made by the man who actually made the decision to terminate Plaintiff's employment, they cannot be direct evidence of impermissible discrimination.[3] See, e.g., Carter v. Univ. of Toledo, 349 F.3d

_____

to reach the conclusion Plaintiff urges.

[3] In her reply in support of her motion for summary judgment, Plaintiff argues cursorily that the "cat's paw" theory of liability should apply here (doc. 56). The "cat's paw" theory of liability "refers to a situation in which 'a biased subordinate, who lacks decision-making power, influences the unbiased decision-maker to make an adverse [employment] decision, thereby hiding the subordinate's discriminatory intent." Bobo v. United Parcel Service, 665 F.3d 741, 755 (6th Cir. 2012). As recently held by the Supreme Court in the context of a statute barring discrimination against military service members, "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." Staub v. Proctor Hospital, 131 S. Ct. 1186, 1194 (2011).

269, 273 (6th Cir. 2003)("comments made by individuals who are not involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination"); Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 433 (6th Cir. 2002)(comments by manager lacking any involvement in the decision-making process do not constitute direct evidence); Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 354 (6th Cir. 1998) ("isolated discriminatory remark made by one with no managerial authority over the challenged personnel decisions is not considered indicative of… discrimination").

Further, even if the facts presented here could somehow be construed to be direct evidence that Scott and Setzer were involved in the decision to terminate Plaintiff's employment, Plaintiff must also show that the statements relate to her termination, and this she has not done.  See, e.g.,

---

The record here contains undisputed evidence that neither Scott nor Setzer was Plaintiff's supervisor, at least for the year leading up to her termination. It is not clear whether cat's paw liability applies to hostile acts by mere co-workers, as opposed to supervisors. The Staub court explicitly "express[ed] no view" on the question.  Id. at n. 4.  The Sixth Circuit has not extended cat's paw liability to the actions of coworkers rather than supervisors, and under the circumstances presented here, this Court will not do so now.  Even if Scott and Setzer could be seen as supervisors without decision-making authority, Plaintiff has not presented any evidence creating a genuine issue as to whether their alleged race and/or sex animus was the proximate cause of her termination, so her cat's paw theory would fail anyway.

Bolander v. BP Oil Co., 128 Fed.Appx. 412, 416 (6th Cir. 2005)(noting that statements that are "unrelated to the decisional process" are not direct evidence, and finding comment made two years prior to employee's discharge "lack[ed] sufficient connection" to the alleged discrimination to be direct evidence). Notably, nearly all of the emails were sent in 2009, a year or more before her employment was terminated, taking those emails out of the realm of possible direct evidence. See, e.g., Phelps v. Yale Sec., Inc., 986 F.2d 1020, 1026-27 (6th Cir. 1993)("Because McCulloch made the statements nearly a year before the layoff, the comments were made too long before the layoff to have influenced the termination decision."). The email containing the "helluva bitch" comment is the email that is closest temporally to the termination, but not only was Hock not a recipient of that email, it was sent four months before Plaintiff's employment ended. The Sixth Circuit has determined that "[d]iscriminatory remarks made while implementing an adverse employment action are likely to reveal animus." Erwin v. Potter, 79 Fed.Appx. 893, 898 (6th Cir. 2003), citing Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 572 (6th Cir. 2003)(emphasis added). "In contrast, occasional disparaging remarks made during the regular course of business about age or other protected characteristics are much

14

more likely to be considered the kind of 'isolated and ambiguous' comments that do not trigger employer liability." Id., citing Phelps, 986 F.2d 1020. Here, the "helluva bitch" comment was not made during the course of terminating Plaintiff's employment, and there is no evidence even connecting that comment in any way to her termination. On the continuum, it clearly falls on the "isolated" end, not on the animus end.

In short, the statements made in the emails require the Court to infer that the decision to terminate Plaintiff's employment was motivated by her race and/or her gender because the statements were not made by the decision-maker and because they were attenuated from her termination by a period of many months. Because inferences are necessary, the evidence upon which Plaintiff relies is not direct but is, instead, circumstantial evidence. Therefore, the Court must apply the McDonnell Douglas framework to the record.

### B. Plaintiff's **Prima Facie** Case

A Title VII plaintiff utilizing circumstantial evidence must first make out a prima facie case of discrimination by showing 1) that she was a member of a protected class; 2) that she was discharged; 3) that she was qualified for the position held; and 4) either that she was replaced by someone outside of the protected class or that

similarly situated non-protected employees were treated more favorably. <u>Geiger</u>, 579 F.3d at 622; <u>Minadeo v. ICI Paints</u>, 398 F.3d 751, 764 (6th Cir. 2005)(internal citations omitted). After the plaintiff has made out a <u>prima</u> <u>facie</u> case of discrimination, the employer must present a legitimate, nondiscriminatory reason for the termination. <u>Chen v. Dow Chem.</u> <u>Co.</u>, 580 F.3d 394, 400 (6th Cir. 2009). The burden of production then shifts back to the plaintiff to show that the employer's proffered nondiscriminatory reason was pretextual. <u>Id.</u>

Here, there is no dispute about the first three prongs. Defendants, however, argue that Plaintiff has failed to meet the fourth prong of the <u>prima facie</u> case because the facts show that Plaintiff was neither replaced by someone outside the class nor was she treated differently from a similarly situated non-protected employee. Defendants are correct.

Plaintiff does not provide any evidence that she was treated differently from a similarly-situated non-protected employee. Instead, she argues that she was replaced by someone outside the protected class because her immediate, albeit temporary, replacement was Defendant Hock, who is a white man. Defendants counter that this argument fails for several reasons, not least that her permanent replacement was a Hispanic woman,

who is therefore a member of the same protected class as Plaintiff.

As discussed by the Eleventh Circuit, the point of requiring a plaintiff to show that she was replaced by someone outside the protected class is that "a company's hiring practices may reveal its underlying motivation.  Therefore, a hiring procedure that reveals evidence of preference for a nonminority is indicative of discriminatory intent." <u>Hawkins v. Ceco Corp.</u>, 883 F.2d 977, 982 (11th Cir. 1989).  In <u>Hawkins</u>, the court reversed the district court's finding that the plaintiff was replaced by a white man, finding instead that the white man merely "performed [the plaintiff's] duties for the next few weeks" and that the plaintiff's replacement was the next person hired for the job permanently, who was African American.  <u>Id.</u> at 984.  Similarly, Plaintiff here was permanently replaced by someone inside the protected class.[4]  While Hock did perform

---

[4]  Plaintiff asserts in her response to Defendants' motion for summary judgment that the woman who replaced her is not actually a member of her protected class because they "are not of the same subset within the protected class of minority females" (doc. 55).  Specifically, Plaintiff's replacement is Hispanic, and Plaintiff is African American, and Plaintiff is a mother of dependent children and a sole provider, while her replacement is not.  Plaintiff thus contends that she has a claim for "sex plus" and "race plus" discrimination and was not replaced by someone with her same characteristics.  The fatal problems with Plaintiff's position are that she has misapprehended the "plus" theory, and she has presented no evidence whatsoever that the fact that she is a single mother

17

Plaintiff's duties for a few weeks until her permanent replacement was hired, that fact provides no basis from which anyone could reasonably infer that Plaintiff's termination was based on impermissible discrimination for several reasons. First, Hock was never actually hired to replace Plaintiff. As Defendants note, given the contractual relationship between PTM and SORTA, SORTA had to agree to the hiring of the next CEO, and Hock's name was never even proposed to SORTA as a permanent

---

factored into Hock's decision to terminate her employment.

"Sex-plus" discrimination exists when a person is subjected to disparate treatment based not only on her sex, but on her sex considered in conjunction with a second characteristic. See e.g., Phillips v. Martin Marietta Corp., 400 U.S. 542, 544 (1971). Under a "sex-plus" theory of discrimination, it is impermissible to treat men characterized by some additional characteristic more or less favorably than women with the same added characteristic. See Fisher v. Vassar College, 70 F.3d 1420, 1448 (2d Cir. 1995). "[G]ender-plus plaintiffs can never be successful if there is no corresponding subclass of members of the opposite gender. Such plaintiffs cannot make the requisite showing that they were treated differently from similarly situated members of the opposite gender." Derungs v. Wal-Mart Stores, Inc., 374 F.3d 428, 439 (6th Cir. 2004), quoting Coleman v. B-G Maintenance Management, 108 F.3d 1199, 1204 (10th Cir. 1997). "[I]f there is no comparable subclass of members of the opposite gender, the requisite comparison to the opposite gender is impossible." Id., quoting Martinez v. N.B.C., Inc., 49 F.Supp.2d 305, 310 (S.D. Ny. 1999).

Plaintiff appears to assert the fact that she is a single mother and her replacement was not is evidence of sex-plus discrimination, but that is not the relevant analysis. To establish a claim for sex-or-race-plus, she needed to have presented evidence from which it could reasonably be inferred that she was treated differently from single fathers or from single parents who are not part of a racial minority. There is absolutely nothing in the record from which such an inference could reasonably be drawn.

18

replacement, let alone agreed to by it.  In contrast, the woman who was hired permanently was agreed to by SORTA, as the contract required.

Second, Hock was already a member of the PTM/SORTA workforce and had been for years.  The Court may permissibly assume in the absence of any evidence to the contrary that Hock was originally hired on bases other than improper discrimination, and Plaintiff has provided no evidence from which the Court could reasonably infer that, suddenly, and only for the few weeks for which he held the CEO position on an interim basis, PTM impermissibly favored his white, male status. See, e.g., Smith v. Page Foam Cushioned Prods. Co., 2005 WL 2176841 *5 (W.D. Pa. Sept. 8, 2005).

Third, Hock is the one who decided to terminate Plaintiff's employment.  The fact that Hock himself took over the duties of CEO only long enough for him to then hire someone else who falls into a protected category cuts against the contention that his decision to terminate Plaintiff's employment was motivated by race and/or sex-based animus.  Had Hock remained in the position permanently or had he permanently hired someone outside the protected class, an inference of discrimination could reasonably have been drawn.  But under the circumstances presented here, such an inference is simply not

reasonable.

"Replacement by a nonminority is the fourth element of a _prima facie_ case because it is evidence of preferential treatment for nonminorities in the work place." _Hawkins_, 883 F.2d at 983. Here, nothing in the record could reasonably be seen to be evidence of such preferential treatment. Consequently, Plaintiff has failed to satisfy the elements of a _prima facie_ case, and the Court therefore does not need to address the issue of pretext.

In sum, Plaintiff has not presented, as she is required to do, "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" and has failed to satisfy the elements of the _prima facie_ case for race or sex discrimination. _See Moore_, 8 F.3d at 339-340. The Court's role in evaluating a motion for summary judgment on a Title VII claim is to "'determine if a plaintiff has put forth sufficient evidence for a reasonable jury to find her to have met the _prima facie_ requirements.'" _Cline v. Catholic Diocese of Toledo_, 206 F.3d 651, 661 (6th Cir.2000). No reasonable jury could, on these facts, find the _prima facie_ requirements met.

## IV.        Conclusion

Because Plaintiff has failed to either adduce direct

evidence of impermissible discrimination or meet her prima facie case, Defendants are entitled to summary judgment on Plaintiff's federal and state discrimination claims (Counts I, II & IV). See Barnhart v. Peckrel, Schaeffer & Ebeling Co., 12 F.3d 1382, 1395 (6th Cir. 1993). In addition to Plaintiff's discrimination claims, she alleges state law claims against Defendants for defamation, libel and slander and tortious interference with a business relationship (doc. 1). The Court finds summary judgment is appropriate on Plaintiff's federal claims and state-law discrimination claim and declines to accept supplemental jurisdiction of Plaintiff's remaining state law claims; they are dismissed without prejudice. See 28 U.S.C. §1367(c); Brandenburg v. Housing Auth. of Irvine, 253 F.3d 891, 900 (6th Cir. 2001). The Court thus GRANTS Defendants' motion (doc. 48) as to Counts I, II & IV, and this matter is closed on the Court's docket.

SO ORDERED.

Dated: February 6, 2013      s/S. Arthur Spiegel_____
                             S. Arthur Spiegel
                             United States Senior District Judge